# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2022-4024

_____

DEPARTMENT OF CHILDREN AND
FAMILIES,

    Appellant,

    v.

RICHARD HERSTEIN,

    Appellee.

_____

On appeal from the Circuit Court for Leon County.
John C. Cooper, Judge.

January 2, 2025

RAY, J.

Dr. Richard Herstein served as Chief Hospital Administrator and Chief Medical Officer at the Florida Department of Children and Families. After he was discharged from that position, he sued the Department alleging whistleblower retaliation. Relevant to this appeal, the trial court granted his request for temporary reinstatement pending resolution of his complaint and awarded him back pay and attorney's fees and costs. The Department challenges this award of temporary relief.

After careful review of the parties' arguments, we conclude that the trial court erred in granting temporary reinstatement because the statements made by Herstein during routine meetings

with his supervisors were not protected disclosures under Florida's Whistle-blower Act ("FWA"). Even if Herstein were entitled to temporary reinstatement, he had no right to back pay and reasonable costs before proving that the Department acted unlawfully.

I

In his petition for reinstatement and in the evidentiary hearing that followed, Herstein explained that his duties at the Department included operational and strategic oversight for the state's mental health treatment facilities and management of their staff. According to Herstein, his employment was terminated in retaliation for making protected disclosures related to an internal investigation into patient abuse and neglect.

As background, in 2020, a patient at one of the mental health facilities suffered severe physical abuse by another patient. This prompted an investigation by the Department's Adult Protective Services Unit (APS), which is authorized to investigate certain allegations of abuse involving vulnerable adults.

Roy Carr, the Director of APS, testified that the investigation was "woefully inadequate." At Carr's request, APS conducted a second investigation. This report, submitted in August of 2021, implicated four individuals, two nurses and two risk managers. Based on these findings, the employees were restricted from providing direct patient care. After the employees complained to Herstein, Herstein contacted Carr about their options. Carr agreed to conduct an executive review of the investigation, which he completed in September of 2021. Carr's findings cleared the four employees of any wrongdoing while identifying two new individuals as responsible.

While the APS investigation was ongoing, the Department's Office of the Inspector General ("IG") began its own investigation. The IG is under the general supervision of the Department's Secretary for administrative purposes but reports to the Governor's Chief Inspector General to maintain independence from the agency. *See* § 20.055(3)(b), Fla. Stat. During the IG review process, which concluded in March of 2022, the four initially accused employees remained on restricted duty.

The Department terminated Herstein from his position on December 29, 2021. In his whistleblower lawsuit that followed, he alleged that he was fired in retaliation for making several protected disclosures relating to the APS investigations. The Department contends that Herstein's termination was for legitimate, non-retaliatory reasons.

On Herstein's petition for temporary reinstatement, the trial court determined that none of his emails or written communications about the investigations qualified as protected disclosures under the FWA. However, it concluded that his oral disclosures made during meetings on September 30 and December 7, 2021, were protected.

For context, Herstein had regular meetings with his direct supervisor, Erica Floyd-Thomas, or her deputy, Meghan Collins, to discuss hospital operations and projects at the facilities. On September 30, Herstein was called into a meeting with Floyd-Thomas to discuss staffing generally and the four employees specifically. According to Herstein, there was a critical staffing shortage at the time of the meeting, particularly with nurses. Herstein said he was eager to get the four employees back to work since he believed they had been exonerated. Floyd-Thomas did not agree that the employees should return to work. She told Herstein to stay out of the APS investigation.

On December 6, Herstein sent an email to Collins and Carr, asking for an update on the APS investigation. The next day, Herstein was called into an impromptu meeting with Collins. According to Herstein, the first thing Collins said when he went to her office was, "I thought we told you to stay out of this." Counsel asked Herstein, "when you showed up in her office, what was the purpose of her inquiry?" Herstein responded, "Her inquiry, her statement, 'I thought we told you to stay out of this,' was in reference to the e-mail that I had sent the evening before regarding the APS investigation." Herstein testified that he told Collins there was a critical staffing shortage and that the four employees should not be on restrictive duty. Carr arrived at a later point during the meeting. In response to Collins' concerns about interference in the APS investigation, Carr interjected that Herstein had not interfered.

3

The trial court determined that at both meetings "[H]erstein responded to an inquiry into the results of the APS investigation." And the court concluded that the "misfeasance [Herstein] complained of at the meetings was [the Department's] negligent APS investigation and negligent failure to timely correct the findings of the investigation." From these findings, the court concluded that Herstein made disclosures protected under the FWA and ordered the Department to reinstate Herstein to his former position, or to an equivalent position, pending the outcome of his whistleblower lawsuit. The court also ordered the Department to compensate Herstein for lost wages from the date of his termination to the date of his temporary reinstatement, and for payment of reasonable costs, including attorney's fees.

This appeal follows. We have jurisdiction. *See* Fla. R. App. P. 9.130(a)(3)(B).*

---

* The Department brought this case as an appeal from a final order, relying on *State, Department of Transportation v. Florida Commission on Human Relations*, 842 So. 2d 253 (Fla. 1st DCA 2003). Although this court found that an order granting temporary reinstatement was a final order in *DOT*, that case was in a different procedural posture than the one before us. There, the Florida Commission on Human Relations ("FCHR") sought temporary reinstatement on behalf of an employee pending the outcome of its investigation into the employee's whistleblower complaint before the FCHR. 842 So. 2d at 254–55. Once the circuit court granted temporary reinstatement, there was nothing more for the court to do in that case. If the employee elected to later bring a civil action after exhausting her administrative remedies, it would be "separate and distinct" from FCHR's reinstatement case. *Id.* at 255. Here, the petition for reinstatement seeks statutorily authorized relief as part of the employee's whistleblower complaint before the circuit court. The civil action remains pending. Unlike in *DOT*, the circuit court's work in this case is not done. We thus treat this as an appeal of a non-final order having the effect of injunctive relief.

4

## II

### A

The FWA was enacted "to prevent agencies . . . from taking retaliatory action against any person who discloses information to an appropriate agency alleging improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty on the part of an agency, public officer, or employee." § 112.3187(2), Fla. Stat. As a remedy for a violation of the FWA, an employee may bring a civil action after exhausting administrative remedies. § 112.3187(8)(a), Fla. Stat.

Temporary reinstatement is required under the FWA if the employee can show that "1) prior to termination the employee made a disclosure protected by the statute; 2) the employee was discharged; and 3) the disclosure was not made in bad faith or for a wrongful purpose, and did not occur after an agency's personnel action against the employee." *State, Dept. of Transp.*, 842 So. 2d at 255 (citation omitted).

Of these requirements, the only one in dispute is whether Herstein made a protected disclosure. Or more to the point, whether he made a disclosure in a manner proscribed by the FWA. Under that prong, the FWA

> protects employees and persons who disclose information on their own initiative in a written and signed complaint; *who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency* or federal government entity; who refuse to participate in any adverse action prohibited by this section; or who initiate a complaint through the whistle-blower's hotline or the hotline of the Medicaid Fraud Control Unit of the Department of Legal Affairs; or employees who file any written complaint to their supervisory officials or employees who submit a complaint to the Chief Inspector General in the Executive Office of the Governor, to the employee designated as agency inspector general under

5

s. 112.3189(1), or to the Florida Commission on Human Relations.

§ 112.3187(7), Fla. Stat. (emphasis added).

The issue here is the proper interpretation of the term "other inquiry." As emphasized above, the FWA "protects employees . . . who are requested to participate in an investigation, hearing, or *other inquiry* conducted by any agency or federal government entity." § 112.3187(7), Fla. Stat. (emphasis added). The trial court did *not* find that Herstein was asked during the September 30 and December 7 meetings to participate in an investigation or hearing into the patient's abuse. To the contrary, Herstein testified that he was told during both meetings to stay out of the investigation. By finding that these meetings constituted an "other inquiry," the trial court broadly interpreted "inquiry" to mean "the process of asking a question." But in context, the Department argues that "inquiry" must mean something more than asking a question during a routine workplace meeting. We agree.

In determining the meaning of a statutory provision undefined by the Legislature, courts "presume that the term bears its ordinary meaning at the time of enactment, taking into consideration the context in which the word appears." *Conage v. United States*, 346 So. 3d 594, 599 (Fla. 2022). Thus, we first determine the ordinary meaning of "inquiry."

Dictionaries from the time a law was enacted are a good place to start. *See City of Tallahassee v. Fla. Police Benevolent Ass'n, Inc.*, 375 So. 3d 178, 184 (Fla. 2023) (recognizing that dictionaries are often the best evidence of ordinary and commonly accepted meanings of words at the time they were written). One dictionary defines "inquiry" to mean: "1. The act of inquiring. 2. A question; query. 3. A close examination of some matter in a quest for information or truth." *Inquiry, The American Heritage Dictionary of the English Language* (2d ed. 1982). Another dictionary defines "inquiry" informally to mean "a request for information," or formally to mean "a systematic investigation often of a matter of public interest." *Inquiry, Webster's New Collegiate Dictionary* (1980 ed.).

6

Yet dictionary definitions get us only so far. These definitions show that "inquiry" can have a different meaning depending on the context in which it is used. With that in mind, "[i]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Advisory Op. to Governor re Implementation of Amend. 4*, 288 So. 3d 1070, 1079 (Fla. 2020) (citation omitted). We must therefore "exhaust 'all the textual and structural clues' that bear on the meaning of a disputed text." *Conage*, 346 So. 3d at 598 (citation omitted).

In ordinary English usage, a general phrase can be given a more specific meaning by the terms associated with it. This linguistic point is illustrated by the related canons of construction, *ejusdem generis* and *noscitur a sociis*.

The canon *ejusdem generis* "limits general terms that follow specific ones to matters similar to those specified." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (cleaned up). It applies to a "catchall phrase at the end of an enumeration of specifics" like the "other inquiry" clause in dispute here. In short, the canon "implies the addition of *similar* after the word *other*." *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012).

And "the commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). "While 'not an inescapable rule,' [*noscitur a sociis*] 'is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth'" to legislation. *McDonnell v. United States*, 579 U.S. 550, 569 (2016).

For example, in *McDonnell*, the United States Supreme Court determined that a routine call, meeting, or event arranged by a government official did not constitute a "question, matter, cause, suit, proceeding or controversy" under a federal statute. *Id.* at 568. The Court observed that a typical call, meeting, or event could qualify as a "question" or "matter" based on the dictionary definitions of those terms. *Id.* But in context, the Court reasoned that "'question or matter' must be similar in nature to a 'cause,

suit, proceeding, or controversy.' Because a typical meeting, call, or event arranged by a public official is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee, it does not qualify as a 'question' or 'matter'" under that statute. *Id.* at 569. The Court further reasoned that the more limited reading of the statute is consistent with the presumption that statutory language is not superfluous. *Id.* The Court explained that "[i]f 'question' and 'matter' were as unlimited in scope as the Government argues, the terms 'cause, suit, proceeding or controversy' would serve no role in the statute—every 'cause, suit, proceeding or controversy' would also be a 'question' or 'matter.'" *Id.*

Here, too, "other inquiry" must be similar in kind to "investigation" or "hearing"—a fact-finding endeavor conducted with a certain level of formality and procedure. To interpret "other inquiry" as encompassing any workplace meetings would render superfluous the language limiting the manner of disclosure that the FWA protects. Any disclosure could be a protected disclosure. But the FWA protects disclosures made in a written complaint or in response to an investigation, hearing, or other inquiry conducted by an agency. § 112.3187(7), Fla. Stat. These requirements of formality are important. This court has observed that "[t]he purpose of the statutory requirement of a signed writing [under the FWA] 'is to document what the employee disclosed, and to whom the employee disclosed it, thus avoiding problems of proof for purposes of the Whistle-blower's Act.'" *Washington v. Fla. Dep't of Revenue*, 337 So. 3d 502, 509–10 (Fla. 1st DCA 2022) (quoting *Walker v. Fla. Dep't of Veterans' Affairs*, 925 So. 2d 1149, 1150 (Fla. 4th DCA 2006)); *see also Hutchison v. Prudential Ins. Co. of Am., Inc.,* 645 So. 2d 1047, 1050 (Fla. 3d DCA 1994) (same). If any meeting, conversation, or questioning regarding workplace issues constituted an "inquiry," it would essentially do away with the safeguards of the statute.

In support of his position, Herstein emphasizes that the FWA is remedial in nature and should be liberally construed. *See, e.g.*, *Irven v. Department of Health & Rehabilitative Services*, 790 So. 2d 403, 405–06 (Fla. 2001). But this notion of statutory construction cannot be used to defeat a fair reading of the statute that is grounded in its text and structure. As we have explained,

8

"other inquiry"—in the company of "investigation" and "hearing"—means something more than informal supervisory interactions. To hold otherwise would frustrate rather than effectuate legislative intent.

Under similar facts, the Eleventh Circuit Court of Appeals reached the same conclusion. In *Anterio v. City of High Springs Florida*, 762 F. App'x. 891, 893 (11th Cir. 2019), a newly hired police chief and the city manager "met regularly to discuss 'goings-on'" within the police department. These discussions included behavioral problems with other officers. *Id.* at 894–95. The police chief's employment was later terminated, and he sued under the FWA. *Id.* at 895. He argued that his oral disclosures made to the city manager during these regular meetings constituted disclosures made during an "investigation, hearing, or other inquiry" under the FWA. *Id.* at 897. But the Eleventh Circuit concluded that Anterio "was not 'requested to participate' in any type of inquiry." *Id.* The court remarked, "[w]hile we do not attempt in this case to define the scope of this clause," the court was "confident that it requires something more than the informal discussions that occurred here between Anterio and [the city manager]." *Id.*

Just so here, there is no evidence that the oral disclosures made by Herstein during the September 30 and December 7 meetings were "requested" as part of an "inquiry" conducted by the Department. The trial court was thus mistaken when it concluded that Herstein made protected disclosures based on the nature of his comments. And because Herstein failed to demonstrate that he made a protected disclosure, it was error for the court to award temporary reinstatement. *See State, Dept. of Transp.*, 842 So. 2d at 255 (explaining that to obtain temporary reinstatement, an employee must show that he made a protected disclosure prior to termination).

B

Because the grant of temporary reinstatement was improper, so too was the award of lost wages and attorney's fees and costs associated with the temporary reinstatement. Even if Herstein were entitled to temporary reinstatement, there is no basis in the

FWA for the award of lost wages and reasonable costs before proving that the Department acted unlawfully.

Turning back to the language of the statute, an employee of a state agency may "bring a civil action" for a violation of the FWA. § 112.3187(8)(a), Fla. Stat. There are six forms of relief that "must" be included "in any action" brought under the FWA:

(9) Relief.—In any action brought under this section, the relief must include the following:

(a) Reinstatement of the employee to the same position held before the adverse action was commenced, or to an equivalent position or reasonable front pay as alternative relief.

(b) Reinstatement of the employee's full fringe benefits and seniority rights, as appropriate.

(c) Compensation, if appropriate, for lost wages, benefits, or other lost remuneration caused by the adverse action.

(d) Payment of reasonable costs, including attorney's fees, to a substantially prevailing employee, or to the prevailing employer if the employee filed a frivolous action in bad faith.

(e) Issuance of an injunction, if appropriate, by a court of competent jurisdiction.

(f) Temporary reinstatement to the employee's former position or to an equivalent position, pending the final outcome on the complaint, if an employee complains of being discharged in retaliation for a protected disclosure and if a court of competent jurisdiction or the Florida Commission on Human Relations, as applicable under s. 112.31895, determines that the disclosure was not made in bad faith or for a wrongful purpose or occurred after an agency's initiation of a personnel action against the employee which includes documentation of the employee's violation of a disciplinary standard or

10

performance deficiency. This paragraph does not apply to an employee of a municipality.

§ 112.3187(9), Fla. Stat.

The trial court granted three forms of relief in this interlocutory proceeding: temporary reinstatement, lost wages, and attorney's fees and costs. But subsection (9)(f) above—which authorizes a limited form of relief on a petition for temporary reinstatement—provides only for "temporary reinstatement to the employee's former position or to an equivalent position, *pending the final outcome on the complaint.*" (Emphasis added.) It does not independently authorize the award of compensation or reasonable costs as part and parcel of that temporary relief. Those forms of relief are instead tied to the merits of the underlying whistleblower *action*.

To be clear, a petition for temporary reinstatement is not an "action" under the FWA. As the name implies, temporary reinstatement is temporary relief "pending the final outcome on the complaint." § 112.3187(9)(f), Fla. Stat. Put simply, temporary reinstatement depends on an underlying cause of action, and is not itself, the action that triggers the mandatory relief afforded by statute.

Herstein acknowledges that the purpose of temporary reinstatement is to preserve the status quo during the pendency of the lawsuit. Even so, he argues it would make little sense to offer temporary reinstatement without making the plaintiff "whole" by awarding lost wages and associated attorney's fees and costs.

In actions brought under the FWA, a court must award "[c]ompensation, if appropriate, for lost wages, benefits, or other lost renumeration caused by the adverse action." § 112.3187(9)(c), Fla. Stat. Lost wages, or back pay, are a form of compensatory damages. *See O'Neal v. Fla. A & M Univ. ex rel. Bd. of Trs. for Fla. A & M Univ.*, 989 So. 2d 6, 10 (Fla. 1st DCA 2008). The purpose of compensatory damages is to compensate a plaintiff for loss or injury sustained due to a wrongful act by the defendant. *See MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 224 (Fla. 2008) ("The fundamental principle of the law of damages is that the person injured by breach of contract or by wrongful or

11

negligent act or omission shall have fair and just compensation commensurate with the loss sustained in consequence of the defendants act which give[s] rise to the action." (quoting *Hanna v. Martin*, 49 So. 2d 585, 587 (Fla. 1950))).

At the point when an employee seeks temporary reinstatement, there has been no demonstration of wrongdoing (read: unlawful retaliation) by the employer. Temporary reinstatement requires only a showing that the employee made a protected disclosure, in good faith, before termination. This differs from the burden of proof to ultimately prevail on a whistleblower retaliation claim. Given that no unlawful action by the Department has been shown, we find that the trial court erred in awarding compensatory damages in the form of lost wages.

Similarly, we find that the trial court erred in awarding attorney's fees and costs upon granting temporary reinstatement. The FWA provides for "[p]ayment of reasonable costs, including attorney's fees, to a substantially prevailing employee." § 112.3187(9)(d), Fla. Stat. Herstein claims he is a substantially prevailing employee because he obtained the only relief sought in his petition for temporary reinstatement. But again, temporary reinstatement is not a stand-alone cause of action under the FWA. The issue, as properly framed, is whether Herstein is the substantially prevailing party in his whistleblower action. And Herstein correctly acknowledges that is yet to be determined.

III

In summary, we conclude that Herstein did not make a protected disclosure that would entitle him to temporary reinstatement under the FWA, and there is no basis for the award of back pay and reasonable costs at this stage of litigation. None of this, of course, is to suggest the outcome of his whistleblower action. As discovery proceeds and more is learned, the merits of the case may come out a different way. Our decision here concerns a preliminary question and is based on a limited record.

For these reasons, the order under review is VACATED.

ROWE and NORDBY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Andrew McGinley, General Counsel, Department of Children and Families, Tallahassee; Dawn M. McMahon and Miriam R. Coles of Henry Buchanan, P.A., Tallahassee, for Appellant.

Marie A. Mattox and Ashley N. Richardson of Marie A. Mattox, P.A., Tallahassee, for Appellee.